UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------X

336 LLC, d/b/a "The Erotica",

              Plaintiff,

       v.

THE CITY OF NEW YORK; HON. BILL DE BLASIO,
as Mayor of the City of New York; and RICK
D. CHANDLER, as Commissioner of Buildings,
Department of Buildings of the City of New
York,

              Defendants.


---------------------------------------------X

**COMPLAINT**

Docket No.
_____

Jury Trial
Demanded

    Plaintiff, by its attorney, Erica T. Dubno, of Fahringer & Dubno / Herald Price Fahringer, PLLC, with offices at 767 Third Avenue, Suite 3600, New York, New York 10017, complaining of the Defendants, respectfully alleges as follows:

## Nature of the Proceeding

    1. The Plaintiff 336 LLC brings this action pursuant to 42 U.S.C. § 1983 to have aspects of Text Amendment N 010508 ZRY to the Zoning Resolution of the City of New York (the "Amended Zoning Resolution" or the "2001 Resolution") declared unconstitutional. A copy of the Amended Zoning Resolution is attached as Exhibit A.

2. The Plaintiff seeks a judgment declaring that aspects of the Amended Zoning Resolution are illegal, invalid, null, void, inoperative and unconstitutional on their face and as applied to the Plaintiff, and other bookstores in New York City that offer some adult expression to the public, under the First and Fourteenth Amendments to the United States Constitution.

3. The Plaintiff also seeks injunctive relief as well as the costs of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988.

## Jurisdiction

4. This suit is brought pursuant to 42 U.S.C. § 1983, et seq.

5. This case arises under the Constitution and laws of the United States.

6. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

7. Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202.

## Venue

8. All or most of the acts complained of here occurred, and continue to occur, within the Southern District of New York. The Plaintiff's bookstore is located in Manhattan, which is within the Southern District of New York. The Defendants' offices are located in Manhattan, which is within the Southern District of New York.

## Parties : The Plaintiff

9. Plaintiff 336 LLC (the "Plaintiff" or the "Bookstore") is a domestic corporation which, for purposes of service of process only, is located in Brooklyn, New York. The Plaintiff has been incorporated under the laws of New York State since on or about April 15, 2014.

10. Under New York law, a corporation is considered to be a "person" within the meaning of 42 U.S.C. § 1983. The corporate Plaintiff possesses constitutional rights and is entitled to protection under the Civil Rights Act.

11. The Plaintiff rents the ground floor commercial property located at 336 Eighth Avenue, New York, New York.  In 2014 the Plaintiff entered into a lease for 10 years and two months, which ends on June 30, 2024.

12. The Plaintiff has operated a video store, known as The Erotica, at 336 Eighth Avenue, between 26th Street and 27th Street, in the Chelsea section of Manhattan, since April of 2014.

13. In 2012, more than a year before the Plaintiff began operating the Bookstore, the New York State Supreme Court declared the Amended Zoning Resolution, which relates to businesses offering adult expression, to be unconstitutional and enjoined its enforcement. The Amended Zoning Resolution, in its entirety, was declared to be unconstitutional between August 30, 2012 and June 6, 2017.

14. The Plaintiff never previously operated this or any other bookstore offering adult material.  The Plaintiff was not party to any prior lawsuit challenging the constitutionality of the Amended Zoning Resolution.

15. The Bookstore provides to the public non-adult information and retail stock, as well as some adult-oriented information.

16. There are 10 private viewing booths in the rear of the Bookstore. These booths, like most peepshow or private viewing booths at bookstores in New York City, offer a selection of 64 channels where patrons can view a variety of sexually explicit films on a screen within the enclosed private space ("Booths").

17. The adult-oriented information offered by the Plaintiff, and upon information and belief at other bookstores in New York City with Booths, is shown or sold only to willing adults on private property as a form of protected expression. There is no contention that any information provided by the Plaintiff is legally obscene under prevailing constitutional standards. This information enjoys a substantial amount of public interest.

18. The information dispensed by the Plaintiff, and upon information and belief in other bookstores with Booths, is fully protected by the First Amendment to the United States Constitution.

19. The Bookstore at 336 Eighth Avenue is located within a C6-2A zoning district.

20. Section 32-01(a) of New York City's Zoning Resolution (the "Zoning Resolution" or "Z.R."), relating to "Special Provisions for Adult Establishments," provides in pertinent part that "Adult Establishments are not permitted" in, inter alia, C6-2 Districts, which, upon information and belief, includes C6-2A Districts.

## Parties : The Defendants

21. The City of New York (the "City") is a duly incorporated and chartered city, organized under the laws of New York State, established and existing within the boundaries of the Bronx, Kings, New York, Queens and Richmond Counties within the State of New York.

22. The City has been authorized and empowered by the laws of the State of New York to establish the Department of City Planning (the "DCP") and the Department of Buildings (the "Buildings Department").

23. The City, through its Department of City Planning and legislative body, the New York City Council, is responsible for drafting and enacting the Amended Zoning Resolution and other amendments to the Zoning Resolution.  The City, through its various departments and agencies, is also responsible for amending and changing zoning districts throughout New York City.

24. Defendant Bill De Blasio is the duly elected Mayor of the City. As its chief executive officer, he is charged with carrying out the duties assigned by law to the Office of the Mayor of the City of New York. The Office of the Mayor is located at City Hall, New York, New York 10007. He is sued in his official capacity.

25. Defendant Rick D. Chandler is the Commissioner of the Department of Buildings of the City of New York. Commissioner Chandler is charged with the administration and enforcement of the Amended Zoning Resolution. His office is located at 280 Broadway, New York, New York 10007. He is sued in his official capacity.

26. At all times material to this Complaint, the Defendants acted under color of law and under the statutes, customs, ordinances, and usage of the State of New York and the City of New York.

27. All of the Defendants' acts -- as well as the acts of their officers, employees, agents, and servants -- were done within the scope and course of their office, employment, agency, and service.

28. All of the Defendants' acts -- as well as the acts of their officers, employees, agents, and servants -- were done at the direction or with the permission and authority of the City of New York.

## Relevant Statutes

29. The First Amendment to the United States Constitution provides, in pertinent part, that "Congress shall make no law ... abridging the freedom of speech,... or the right of the people to peaceably assemble."

30. The Fourteenth Amendment to the United States Constitution provides, in pertinent part, that "[n]o State shall ... deny any person of life, liberty, or property,

without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

31. The federal civil rights statute, 42 U.S.C. § 1983, provides in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other persons within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

### Factual Background

32. The City's Zoning Resolution, adopted on December 15, 1961, made no distinction between adult entertainment uses and other commercial uses that do not have an adult character. While historically the City regulated several general classes of commercial establishments under its Zoning Resolution adult-oriented businesses had never been differentiated from other commercial uses.

33. As of the fall of 1993, there were approximately 177 adult establishments in New York City: 107 in Manhattan; 44 in Queens; 15 in Brooklyn; 8 in the Bronx; and 3 in Staten Island.

34. A survey performed by the City's Department of City Planning in 1993 indicated that there were 86 adult bookstores, 23 adult theaters, and 68 adult eating or drinking establishments. Upon information and belief, the survey conducted at that time did not differentiate between bookstores with Booths and those without Booths.

35. Upon information and belief, the adult establishments that existed in New York City at that time offered exclusively adult material.

36. On November 23, 1994, the New York City Council imposed a one-year moratorium prohibiting the establishment of new adult businesses, barred the extension or enlargement of existing adult businesses, and prohibited the change of any use to an adult enterprise in all areas of New York City. Z.R. § 11-113.

### The 1995 Adult Zoning Resolution

37. On October 25, 1995, the City Council adopted Text Amendment N 950384 ZRY to the Zoning Resolution (the "1995 Resolution"). A copy of the 1995 Resolution is attached as Exhibit B. The 1995 Resolution defined an "adult establishment" and then imposed strict zoning, locational, and other restrictions on uses that fall within that definition.

38. Under the 1995 Resolution, an "adult establishment" is defined as a commercial business a "substantial portion" of which includes: An adult bookstore (including videostores); an adult eating or drinking establishment; an adult theater; or other adult commercial establishment. Z.R. § 12-10.

39. An adult establishment was further defined as a store where a "substantial portion" of its "stock-in-trade" is characterized by an emphasis on "specified sexual activities" or "specified anatomical areas," or a business which "regularly features" films or live performances that depict an emphasis on "specified sexual activities" or "specified anatomical areas." Z.R. § 12-10.

40. Although the text of the 1995 Resolution contained some ambiguities as to what actual percentage constitutes a "substantial portion," the factors to be considered were "the amount of [adult] stock accessible to customers as compared to the total stock accessible to customers in the establishment" and "the amount of floor area and cellar space accessible to customers and allocated to [adult] uses as compared to the total floor area and cellar space accessible to customers in the establishment." Z.R. § 12-10.

41. The definitions of "adult eating or drinking establishments," "adult theaters," and "other adult commercial establishments" also included a provision that the establishment "is not customarily open to the general public during such features because it excludes minors by reason of age." Z.R. § 12-10. There was no age exclusion requirement in the definition of "adult bookstores."

42. The 1995 Resolution relegated adult establishments to limited zoning districts within the City. It barred the operation of adult establishments within C1, C2, C3, C4, C5, C6-1, C6-2 or C6-3 Districts. Z.R. § 32-01[a]. These are the

primary commercial districts which are most suitable for small retail stores in local and convenient areas.

43. Under the 1995 Resolution, adult establishments were consigned to C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, C8, and Manufacturing Districts.

44. In addition, the 1995 Resolution imposed the following limitations on adult establishments within the few remaining available districts:

> a. Adult establishments must be located at least 500 feet from a church, school, Residence District, or certain Commercial and Manufacturing Districts including C1, C2, C3, C4, C5-1, C6-1, C6-2 and C6-3 districts (Z.R. §§ 32-01[b], 42-01[b]);
>
> b. adult establishments must be located at least 500 feet from another adult establishment (Z.R. §§ 32-01[c], 42-01[c]);
>
> c. only one adult establishment can be located on a zoning lot (Z.R. §§ 32-01(d), 42-01[d]); and
>
> d. adult establishments may not exceed 10,000 square feet of floor area and cellar space (Z.R. §§ 32-01[e], 42-01[e]).

45. Existing adult establishments were given one year in which to conform to the 1995 Resolution or terminate their business. Z.R. §§ 52-77, 52-734.

46. On February 27, 1996, more than 100 owners and operators of adult establishments commenced an action for a declaratory judgment in the New York Supreme Court against the City of New York, and its relevant officials, to have the 1995 Resolution held unconstitutional. Amsterdam Video, Inc. v. City of New York, Index No. 103568/96 (Sup. Ct. N.Y. Co.).

47. On that same date, the New York Civil Liberties Union ("NYCLU") filed the related case of Hickerson v. City of New York, Index No. 103569/96 (Sup. Ct. N.Y. Co.), on behalf of various consumers of adult expression. On or about July 22, 1996, counsel for an upscale adult-oriented cabaret commenced a separate challenge to the 1995 Resolution. Stringfellow's of New York, Ltd. v. City of New York, Index No. 113049/96 (Sup. Ct. N.Y. Co.).

### The City Removed the Lawsuits into Federal Court

48. On March 27, 1996, the City filed a Petition for Removal, pursuant to 28 U.S.C. § 1446(d), in the United States District Court for the Southern District of New York. Amsterdam Video Inc. v. City of New York, Docket No. 96 Civ. 2204. The City was seeking to have the federal courts review the constitutionality of its adult zoning resolution.

49. On June 27, 1996, Judge Miriam Goldman Cedarbaum granted the plaintiffs' motions, made pursuant to 28 U.S.C. § 1447(c), to remand the state causes of action back to the New York State Supreme Court. Hickerson v. City of New York and Amsterdam Video Inc. v. City of New York, 932 F. Supp. 550 (S.D.N.Y. 1996). Judge Cedarbaum retained jurisdiction of the causes of action that asserted federal constitutional rights, but held them in abeyance pending resolution of the state claims.

50. The New York Supreme Court upheld the 1995 Resolution. Stringfellow's of New York, Ltd. v. City of New York, 171 Misc.2d 376 (Sup. Ct. N.Y. Co. 1996). The Appellate Division, First Department, affirmed. Stringfellow's of New York, Ltd. v. City of New York, 241 A.D.2d 360 (1st Dept. 1997). And, on February 24, 1998, the New York Court of Appeals affirmed. Stringfellow's of New York, Ltd. v. City of New York, 91 N.Y.2d 382 (1998).

51. The businesses then sought review of their federal constitutional claims which the City had removed into the Southern District of New York. However, the bookstores, theaters, and cabarets, which had all been parties in the state

proceedings, were collaterally estopped from pursuing their claims in federal court. Hickerson v. City of New York, 997 F. Supp. 418 (S.D.N.Y. 1998), aff'd, 146 F.3d 99 (2d Cir. 1998), cert. denied, 525 U.S. 1067 (1999).

### The 60/40 Provision

52. On July 20, 1998, when it became clear that application of the 1995 Resolution was inevitable, counsel for the adult-oriented businesses sought to enjoin its enforcement in federal court because the key term defining an adult establishment -- "substantial portion" -- was vague. See Amsterdam Video, Inc. v. City of New York, Docket No. 96 Civ. 2204 (MGC) (S.D.N.Y.).

53. On July 24, 1998, in response to and out of a concern for the vagueness challenge, the City asserted before Judge Cedarbaum that any commercial establishment that has less than 40 percent of adult stock-in-trade, or allocated less than 40 percent of its accessible floor area to an adult use, would comply with the 1995 Resolution. Id.

54. The 60/40 Provision applied to all types of businesses -- including bookstores with Booths.  Thus, as long as a bookstore reduced its adult component to less than 40 percent of the bookstore's floor space and stock it could exhibit a selection of adult films to the public in the privacy of viewing booths without having to close, relocate or censor that aspect of its expression.

## The Enforcement Proceedings

55. The 60/40 Provision became the governing standard used by bookstores and other enterprises to bring their establishments into compliance with the 1995 Resolution.  Many bookstores reduced their number of Booths to minimize their concentration of adult material and to diversify their entertainment and expression. For instance, Show World Center, a bookstore located at the corner of 42nd Street and Eighth Avenue, removed more than 50 peepshow and related booths to comply with the 1995 Resolution.  See City of New York v. Show World, Inc., 178 Misc.2d 812, 819 (Sup. Ct. N.Y. Co. 1998).

56. The City commenced a long series of nuisance abatement proceedings against the new 60/40 businesses.

57. Some establishments that had not adequately modified their businesses were closed. Judicial findings were also made that bookstores and theaters, which had substantially reconfigured their businesses to radically reduce the amount of adult material offered to the public, did not constitute adult establishments and, thus, were not subject to closure under the Nuisance Abatement Law.

58. Even though the 1995 Resolution provided that the City's building inspectors should only look to relative floor space and stock to determine whether a commercial establishment fell within the definition of an "adult establishment," the City sought to introduce subjective and additional factors into a determination of whether a business was in violation of the 1995 Resolution.

59. The New York Court of Appeals concluded that stock and floor area were the only relevant factors to be considered under the 1995 Resolution and it was impermissible for the City to claim that an establishment's compliance was, in reality, a "sham." City of New York v. Les Hommes, 94 N.Y.2d 267 (1999); City of New York v. Dezer Properties, Inc., 95 N.Y.2d 771 (2000).

**The City Enacted the Amended Zoning Resolution in 2001**

60. According to the City Planning Commission's 2001 Report, which provided the legislative history for the Amended Zoning Resolution, in 2000 there were 136 adult establishments in New York City. See CPC 2001 Report at 6. A copy of this Report is attached as Exhibit C. Of those businesses, 101 were identified as 60/40 establishments. Id.

61. In 2000 there were "35 adult bookstores [bookstores without Booths], 57 adult eating or drinking establishments and 44 adult theaters [businesses with Booths]." CPC Report at 9. Upon information and belief, of the 44 "adult theaters," 42 were 60/40 bookstores with Booths while two were traditional movie theaters with large screens and auditorium seating.

62. On March 22, 2001, toward the end of Mayor Rudolph W. Giuliani's term, the Department of City Planning submitted Application No. N 010508 ZRY to the City Planning Commission to amend the definition of "adult establishment" contained within Z.R. § 12-10 and, inter alia to impose additional restrictions relating to adult businesses.

63. The "substantial portion" language of the 1995 Resolution was removed from the definition of "adult establishment" so that the 60/40 Provision is no longer applicable to theaters, eating or drinking establishments, private viewing booths, or any use other than a "bookstore."

64. Section 12-10 still requires a bookstore to devote less than a substantial portion (40 percent) of its stock and accessible floor area to adult material. However, the Amended Zoning Resolution includes nine other "features" that building inspectors can consider in determining whether a business that complies with the 60/40 floor space and stock requirements is an impermissible adult establishment.

65. Specifically, under the Amended Zoning Resolution a bookstore's non-adult "printed or visual material" (non-adult stock) "shall not be considered stock-in-trade" (and, thus, is a sham) for purposes of a "substantial portion" (60/40) analysis where the store has "one or more of the following features":

  a. An interior configuration and lay-out which requires customers to pass through an area of the store with "adult printed or visual material" in order to access an area of the store with "other

printed or visual material" (Z.R. § 12-10[2][d][aa]);

b. One or more individual enclosures where adult movies or live performances are available for viewing by customers (Z.R. § 12-10[2][d][bb]);

c. A method of operation which requires customer transactions with respect to "other printed or visual material" to be made in an area of the store which includes "adult printed or visual material" (Z.R. § 12-10[2][d][cc]);

d. A method of operation under which "other printed or visual material" is offered for sale only and "adult printed or visual material" is offered for sale or rental; (Z.R. § 12-10[2][d] [dd]);

e. A greater number of different titles of "adult printed or visual material" than the number of different titles of "other printed or visual material" (Z.R. § 12-10[2][d][ee]);

f. A method of operation which excludes or restricts minors from the store as a whole or from any section of the store with "other printed or visual material" (Z.R. § 12-10[2][d][ff]);

g. A sign that advertises the availability of "adult printed or visual material" which is disproportionate in size relative to a sign that advertises the availability of "other printed or visual material", when compared with the proportions of adult and other printed or visual materials offered for sale or rent in the store, or the proportions of floor area or cellar space accessible to customers containing stock of adult and other printed or visual materials (Z.R. § 12-10[2][d][gg]);

h. A window display in which the number of products or area of display of "adult printed or visual material" is disproportionate in size relative to the number of products or area of display of "other printed or visual material", when compared with the

proportions of adult and other printed or visual materials offered for sale or rent in the store, or the proportions of floor area or cellar space accessible to customers containing stock of adult and other printed or visual materials (Z.R. § 12-10[2][d][hh]); or

i. Other features relating to configuration and layout or method of operation, as set forth in rules adopted by the Commissioner of Buildings, which the Commissioner has determined render the sale or rental of "adult printed or visual material" a substantial purpose of the business conducted in such store (Z.R. § 12-10[2][d][ii]).

66. Thus, even if a bookstore devotes less than 40 percent of its stock and floor space to adult material, all of its non-adult stock is completely disregarded and deemed to be a sham if, for example, the establishment has Booths where adult movies are available for viewing by customers.

67. On October 31, 2001, the City Council ratified the Amended Zoning Resolution, which provided for a one-year amortization period until October 31, 2002 for existing businesses.

### The Supreme Court and Appellate Division Found
### the 2001 Amendments to be Unconstitutional

68. On September 26, 2002, a small bookstore in Manhattan, and a theater in Queens, representing the interests of the transformed 60/40 businesses (the "Bookstores"), sought injunctive relief before Justice Louis B. York, in the Supreme Court, New York County.

69. Justice York granted summary judgment to the Bookstores. For the People Theatres of N.Y., Inc. v. City of New York, 1 Misc. 3d 394 (Sup. Ct. N.Y. Co. 2003), Ten's Cabaret, Inc. v. City of New York, 1 Misc. 3d 399 (Sup. Ct. N.Y. Co. 2003) (related action brought by cabarets challenging the same law).

70. The Appellate Division reversed and upheld the 2001 Resolution. For the People Theatres of N.Y., Inc. v. City of New York, 20 A.D.3d 1 (1st Dept. 2005) ("Appellate Division I").

71. The New York Court of Appeals found that a question of fact existed as to whether 60/40 businesses were so transformed in character that they no longer resemble the kinds of exclusively adult uses found back in 1994 to create negative

secondary effects. Questions of fact also existed concerning whether these businesses' "technical compliance with the 60/40 formula is merely a sham." Thus, the court remanded the matter back to Justice York for a trial. See For the People Theatres of N.Y., Inc. v. City of New York, 6 N.Y.3d 63 (2005). Three dissenting Judges (Kaye, C.J., G.B. Smith, & Ciparick, JJ.) would have struck down the 2001 Resolution.

72. On March 29, 2010, on remand, Justice York found that the City failed to meet its burden of proof to establish that theaters, which reduce their adult component to less than 40 percent, have a predominant, ongoing focus on adult materials. The City did not appeal Justice York's judgment relating to theaters. Relating to bookstores, including those with Booths, Justice York found that the City met, what he labeled, its "light" burden. For the People Theatres of N.Y., Inc. v. City of New York, 27 Misc. 3d 1079 (Sup. Ct. N.Y. 2010).

73. On April 7, 2011, a unanimous panel of the Appellate Division vacated the findings relating to bookstores. The Appellate Division remanded the case back to Justice York with instructions concerning how to determine whether 60/40 businesses have a predominant focus on sexually explicit

materials. See For the People Theatres of N.Y., Inc. v. City of New York, 84 A.D.3d 48 (1st Dept. 2011) ("Appellate Division II").

74. On August 30, 2012, after re-considering the trial evidence and following the directions from the Appellate Division, Justice York declared the 2001 Resolution to be unconstitutional. See For the People Theatres of N.Y., Inc. v. City of New York, 38 Misc. 3d 663, 675 (Sup. Ct. N.Y. Co. 2012).

75. On July 21, 2015, the Appellate Division affirmed Justice York's judgment that permanently enjoined the City from enforcing the amendments. See For the People Theatres of N.Y., Inc. v. City of New York, 131 A.D.3d 279 (1st Dept. 2015) ("Appellate Division III").

### The Court of Appeals' Decision in 2017

76. On June 6, 2017, the New York Court of Appeals, with only five Judges sitting, reversed the Appellate Division and trial judge. See For the People Theatres of N.Y., Inc. v. City of New York, 29 N.Y.3d 340 (2017). The court upheld the constitutionality of the 2001 Resolution.

77. The Bookstores moved for reargument of the Court of Appeals' June 6th decision based upon the court's failure to address and possibly consider the Bookstores' claim that the zoning provisions, which seek to regulate how a business operates internally, are impermissible and exceed a municipality's zoning authority.   The motion also identified the unaddressed claim that the 2001 Resolution gives unbridled discretion to the Building Commissioner to regulate the operation of bookstores. To date that motion is still pending.

78. For the entire 16-year period since New York City amended its Zoning Resolution back in 2001 the provisions of the Amended Zoning Resolution had never been enforced. Instead, they were consistently stayed or enjoined through a series of court orders and decisions.

79. On June 7, 2017, the City agreed to stay enforcement of the 2001 Resolution for 30 days.

80. On June 27, 2017, the New York Court of Appeals denied the Bookstores' application for a stay pending an application to the United States Supreme Court for a writ of certiorari. On July 6, 2017, Supreme Court Justice Ruth Bader Ginsburg denied a similar application by the Bookstores.

81. On August 2, 2017, without waiving any claims or making any concessions, the City and counsel for the Plaintiff entered into a stipulation staying enforcement of certain aspects of the Amended Zoning Resolution as to existing bookstores with Booths pending a determination of the proceedings in the United States Supreme Court.

82. On February 20, 2018, the Supreme Court denied the Bookstores' application for certiorari in *JGJ Merchandise Corp. v. City of New York*, No. 17-844.

### Elimination of Private Viewing Booths

83. Viewing booths provide patrons with an opportunity to select between various film offerings that may not be available anywhere else. Booths may also enable people to preview films that they may seek to purchase at the videostore.

84. Booths allow consenting adults to view a wide range of sexually explicit material within the privacy and sanctity of a safe space. No one knows what selection a particular person views within the Booth. Thus, Booths enable patrons to watch non-obscene films that some might believe are deviant,

aberrant, queer, perverse or unorthodox, within a judgment-free zone.

85. Upon information and belief, there are currently approximately 20 to 25 bookstores in New York City that fall within the Amended Zoning Resolution's definition of an "adult establishment" because they have Booths where patrons may view adult films.

86. Upon information and belief, virtually no bookstores with Booths are located within permissible areas for "adult establishments" under the Amended Zoning Resolution. Upon information and belief there are only two bookstores with Booths in areas where exclusively adult establishments are allowed to operate ("Permissible Areas"), in the entire City of New York.

87. In this digital age, where Internet searches are all cached and online purchase can always be traced, the Booths provide an old school means by which a patron can watch erotica without anyone knowing his or her personal predilections, fetishes, and sexual fantasies.

88. Private viewing booths, which each usually have individual screens ranging in size between 20 inches and 40 inches, cost on average, between $5,000 and $10,000 each.

89. The 1995 Resolution provided that bookstores could have Booths in a portion of the store.  In stark contrast, the 2001 Resolution effectively eliminates a constitutionally protected form of expression and entertainment that has existed in New York for decades.

90. Under the Amended Zoning Resolution the City Council has now banned all Booths from the entire City of New York except in the extremely limited areas where 100 percent adult establishments can endeavor to locate. Upon information and belief, there are insufficient and/or no viable locations within those very limited areas for the bookstores with Booths that will be displaced by the Amended Zoning Resolution to operate and disseminate their constitutionally protected expression.

91. Upon information and belief, the total number of potential sites where adult establishments can now be located is far less than the number of existing 60/40 bookstores with Booths. And, when the 60/40 eating or drinking establishments

that are displaced by the Amended Zoning Resolution, which are estimated to be approximately 13, are factored into the equation, there will certainly be less sites than the total number of adult establishments that existed before the 1995 Resolution and/or the 2001 Resolution were enacted.

### The Amended Zoning Resolution Does Not Provide for Constitutionally Adequate Alternative Avenues of Communication

92. The Amended Zoning Resolution violates the First and Fourteenth Amendments to the United States Constitution because it does not provide for reasonable alternative avenues of communication.

93. When the City enacted the 1995 Resolution it generated maps of the limited Permissible Areas where adult establishments could endeavor to locate. Copies of the City's maps, which were part of the record supporting the 1995 Resolution, are annexed collectively as Exhibit D.

94. On the maps from the 1995 Resolution, the areas indicated in light purple depict areas zoned M1, C7 or C8 where adult uses could locate. The darker purple sections depict areas zoned M2 or M3 where adult uses (other than bookstores

without Booths) could locate. Pink sections depict areas zoned C6-4, C6-5, C6-6, C6-7, C6-8 and C6-9 where adult uses could locate.

95. On the maps from the 1995 Resolution, areas marked in yellow depict sites located within the proper zones that are encumbered because, <u>inter</u> <u>alia</u>, they include airports, utilities, fuel tank farms, transportation right-of-ways, large municipal facilities, certain large parcels of publicly-owned land, and areas characterized by wetlands. On the maps from the 1995 Resolution, areas marked in brown depict proposed rezonings that would preclude adult uses.

96. The City determined that approximately 4 percent of its total land area, taking into account the encumbered areas, was available for adult uses.

### There Were Changes in Zoning in New York City Between 1995 and 2001 that Reduced the Total Number of Permissible Areas for Adult Establishments

97. The percentage of available space -- which was extremely limited in the first place -- has been significantly curtailed and reduced in the 22 years since 1995.

98.  In affirming the 1995 Resolution, the New York Court of Appeals noted that when imposing zoning restrictions on establishments that offer constitutionally protected expression to the public the City "must assure reasonable alternative avenues of communication." 91 N.Y.2d at 402, citing City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986).

99. To pass constitutional muster under the First Amendment there must be ample space available for adult uses after the rezoning.

100. Enforcement of the ordinance must neither substantially reduce the total number of adult outlets nor significantly reduce the accessibility of those outlets to their potential patrons.

101. In enacting the 2001 Resolution the City offered no additional locations for businesses displaced by the Amended Zoning Resolution.

102. To the contrary, the City acknowledged that "[s]ince 1995, there have been 13 changes in the zoning map which have rezoned certain areas where adult uses had been permitted. These map changes have reduced the amount of unencumbered land

area available to adult establishments by about 200 acres." See David Karnovsky Aff., dated October 2002, For the People Theatres of N.Y., Inc. v. City of New York, No. 121080/02 (Sup. Ct. N.Y. Co.), ¶ 87.

103. In October of 2002 the City further acknowledged that "since 1995, changing in the number and location of 'sensitive receptors' have further reduced the land area available to adult establishments by another 65 acres, again reducing the number of potential development sites." Id. The City stated that "the estimated number of potential sites for adult businesses in New York City decreased by 9% between 1995 and 2000." Id. at ¶ 88.

104. Attached, as Exhibit E, are maps generated by the City's Department of City Planning that purport to depict zoning changes that occurred within the City between when the 1995 Resolution and the 2001 Resolutions were enacted.

**The City Engaged in Substantial Rezoning After
the Adult Zoning Resolution was Enacted in 2001,
Which Radically Reduced the Amount of
Permissible Areas for Adult Establishments**

105. The landscape of New York City has changed markedly in the 16 years that have elapsed since the Amended Zoning Resolution was enacted in 2001.

106. Since 2001, the City has engaged in radical rezoning of Permissible Areas for adult uses.

107. For instance, upon information and belief, since 2001, the City has substantially rezoned portions of (and/or created special zoning districts in) College Point, Queens; Hunters Point, Queens; Long Island City, Queens; Willets Point, Queens; Sunset Park, Queens; DUMBO, Brooklyn; Greenpoint, Brooklyn; Williamsburg, Brooklyn; Manhattan's West Side; and Hunts Point, Bronx, among other areas.

108. Attached, collectively as Exhibit F, are zoning maps generated by the City's Department of City Planning, which demonstrate significant changes made by the City since 2001 to zoning in areas that the City previously urged were permissible for adult uses. These maps are illustrative only and by no means exhaustive of the extensive changes that have

substantially diminished Permissible Areas for adult uses since the 1995 Resolution and 2001 Resolution were enacted.

109. According to the Department of City Planning,

> [b]etween 2002 and January 2012, the City Planning Commission and City Council approved rezonings of manufacturing districts to reflect local characteristics better and to guide new investment.

> The modifications to manufacturing districts are diverse, in cases permitting new residential neighborhoods to grow in post-industrial areas.... These modifications are also widely dispersed, encompassing every borough.[1] A copy of this report is attached as Exhibit G.

110. The "manufacturing rezonings in this 10-year period [2002 to 2012] reduced the total acreage of these districts by 5.2 percent or slightly more than 1,100 acres citywide." Id.

111. In Manhattan, in the first 10 years after the City enacted the Adult Zoning Resolution in 2001, "[a]pproximately 26% of lot area zoned for manufacturing, or 265 acres, were mapped into another district." Id.

---

[1] See http://www1.nyc.gov/site/planning/zoning/districts-tools/mfg-districts-2002-2012.page.

112. In Brooklyn, 149 acres were rezoned from Manufacturing Districts to Residence Districts. Similarly, in Queens, 109 acres were rezoned from Manufacturing Districts to Residence Districts. The Bronx lost 56 acres of Manufacturing Districts to Residence Districts through rezoning. Forty-one acres of Manufacturing Districts were rezoned to Residence Districts in Staten Island. And, in Manhattan 31 acres were rezoned to residential from Manufacturing Districts.

113. Adult establishments are not allowed to be located in Residence Districts or within 500 feet of Residence Districts. Z.R. §§ 32-01(b), 42-01(b). Thus, by rezoning Manufacturing Districts to Residence Districts the bookstores lose potentially Permissible Areas. Moreover, the limited areas were further decreased by that large 500-foot buffer zone that surrounds Residence Districts. The same is true for C1, C2, C3, C4, C5-1, C6-1, C6-2 and C6-3 Districts.

114. Even within Manufacturing Districts adult establishments are not permitted within "Mixed Use" Districts, which mix residential and non-residential uses. This is significant because since 2002, the City has rezoned at least 324 acres from Manufacturing Districts, where adult

establishments might be permissible, to Mixed Use Districts, which bar adult uses. And, adult establishments are not permitted within a 500-foot radius of Mixed Use districts.

115. Since the 2001 Resolution was enacted the City has also rezoned at least 213 acres from Manufacturing Districts to new parks, public open spaces, or preserved natural areas. Indeed, at least 113 acres on Staten Island that the City previously indicated were permissible for adult establishments were rezoned to parkland. Adult establishments are prohibited in each of those areas, which are traditionally deemed to be "encumbered" by the City.

116. Upon information and belief, the City is currently in the process of potentially rezoning other Permissible Areas, such as the vast Gowanus section of Brooklyn, which could make those areas unavailable for adult uses.

**The Amended Zoning Resolution Contains Other Locational Restrictions that Further Burden and Preclude Bookstores from Operating**

117. The Amended Zoning Resolution now provides that adult establishments shall be located at least 500 feet from certain Manufacturing Districts in which new residences, new joint living-work quarters for artists or new loft dwellings are allowed, under the provisions of the Zoning Resolution, as-of-right or by special permit or authorization. Z.R. §§ 32-01(b), 42-01(a). This 500-foot buffer applies regardless of whether such a special permit or authorization requires an assessment of the impact of new residences, new joint living-work quarters for artists or new loft dwellings on commercial or manufacturing uses within the Manufacturing Districts. Z.R. §§ 32-01(b), 42-01(a).

118. This provision was included in the 2001 Resolution to nullify a judicial decision that found against the City. In City of New York v. "The Black Garter", 273 A.D.2d 188 (2d Dept. 2000), the Appellate Division, Second Department, held that a topless club which had operated for 25 years in a Manufacturing District on Staten Island could not be closed as

a nuisance merely because it was within an area that authorizes development or enlargement of residential uses.

119. Upon information and belief, in the 16 years that have elapsed since the 2001 Resolution was enacted (but never enforced) the City never studied or ascertained the effects and/or consequences of these restrictions on adult establishments even though the City was, during this time, creating additional mixed uses in Manufacturing Districts.

### The Creation of a Permit Requirement

120. The Amended Zoning Resolution now imposes a permit requirement on adult businesses that wish to operate in the limited number of Permissible Areas in the City for adult establishments.

121. Sections 32-01 and 42-01 of the Zoning Resolution were amended to provide that

> an adult establishment shall be established upon the date of a permit issued by the department of buildings therefor, or, in the case of an adult establishment in existence prior to August 8, 2001, as determined by the department of buildings, subject to rules as the department of buildings may prescribe regarding the failure to perform work authorized under a permit

                    or to commence operation pursuant to a
                    permit and the discontinuance of an
                    adult establishment.

122. The 2001 CPC Report relating to the Amended Zoning Resolution indicates that the Department of Buildings would be responsible for "establishing permit filing requirements for new establishments which wish to establish a priority for purposes of the 500 foot rule, but do not require a new building or alteration permit in order to open for business." See Exhibit C at 41.

123. Upon information and belief, the Amended Zoning Resolution requires a bookstore with Booths that endeavors to build a business in a Permissible Area to obtain a permit from the City's Building Department to ensure that the bookstore is not forced to close because another adult business opens within 500 feet.

124. Upon information and belief, the process to obtain such a permit from the Buildings Department can take up to one year or longer. Unlike other applications to the Buildings Department, which may be self-certified or self-issued by an architect, which substantially expedites the approval process, that mechanism is not available to adult establishments.

125. As a consequence, a bookstore that follows the new procedure and applies for a permit to operate within a Permissible Area may be forced to close or denied the right to operate -- and have its expression silenced -- if a church, school or another adult business opens within 500-feet while the bookstore is waiting for its application to get approved.

126. Such disparate treatment of establishments seeking to offer constitutionally protected expression to the public violates the First Amendment's guarantee of free speech and the Fourteenth Amendment's assurance of equal protection.

127. While bookstore owners may endeavor to find a new location they are significantly hindered and hampered by the fact that they must be more than 500 feet from "sensitive receptor" such as a church or school. Even if the Plaintiff managed to find a suitable location for a bookstore with Booths within the proper zoning district the Plaintiff would also have to ensure that the location is not within 500 feet of a sensitive receptor. However, a small bookstore owner has no way of knowing whether or not a small religious congregation or charter school is nestled within a large office building, college or other use.

128. Upon information and belief, there are no publicly accessible databases and/or records listing all currently existing schools and churches, including mosques, synagogues, temples, and other houses of worship.

### Virtually All of the Limited Permissible Areas Claimed to be Available for Bookstores Displaced by the Amended Zoning Resolution Are Not Legally or Physically Available as Receiving Sites

129. The Amended Zoning Resolution consigns the Plaintiff's bookstore, and all similarly situated bookstores with Booths, to limited remote areas of the City without considering whether such areas could support or are suitable for the displaced uses.

130. These districts are, for the most part, distinct from general commercial areas where small bookstores are located.

131. For instance, adult establishments are nominally allowed in C7 Districts. However, C7 Districts are only "designed to permit large open amusement parks", such as Coney Island in Brooklyn, and are "mapped in only a few areas." Z.R. § 31-17. Bookstores -- which usually operate within what is called Use Group 6 for retail -- are not even permitted to be located within C7 Districts.

132. Adult establishments are also nominally allowed in C8 Districts.  These Zoning Districts provide for automotive and other heavy commercial services that often require large amounts of land. According to the Zoning Resolution, "[s]ince these service establishments often involve objectionable influences, such as noise from heavy service operations and large volumes of truck traffic, they are incompatible with both residential and retail uses." Z.R. § 31-18.

133. M3 (Manufacturing) Districts, which are also nominally permissible for adult establishments, are "designated for areas with heavy industries that generate noise, traffic or pollutants. Typical uses include power plants, solid waste transfer facilities and recycling plants, and fuel supply depots."[2]

134. Bookstores generally are not even permitted within M2 and M3 Manufacturing Districts. See Z.R. § 42-13.

---

[2] http://www1.nyc.gov/site/planning/zoning/districts-tools/m3.page.

135. Upon information and belief, bookstores with Booths are permitted within M2 and M3 Districts because under the 1995 Resolution and the 2001 Resolution a bookstore with Booths is classified as an "adult theater" which is permissible within M2 and M3 Districts.

136. Upon information and belief, a bookstore with Booths located within an M2 or M3 District may be forced to close, and silence its other constitutionally protected expression, if it no longer operates its Booths because it is not permitted, as-of-right, within those Manufacturing Districts

137. Upon information and belief, many of the permissible areas claimed to be available for the relocation of adult establishments, displaced by the Amended Zoning Resolution, are not legally or physically available as receiving sites.

138. Upon information and belief, virtually all of the designated areas consist of land with physical characteristics that render them unavailable for any kind of retail commercial development.

139. Upon information and belief, the legal attributes of the suggested receiving sites are such that they exclude bookstores. Thus, they cannot be considered "available" for constitutional purposes under the First Amendment.

140. The receiving sites are developed in a manner unsuitable for bookstores or small retail and commercial businesses. For instance, many of the designated receiving sites are occupied by warehouses, gasoline storage tanks, parking lots and other such facilities, or undeveloped land, that are ill-suited for the relocation of bookstores.

141. Upon information and belief, many of the proposed receiving sites may be burdened with toxic waste problems that would make occupying the site financially unfeasible.

142. The cost of altering or developing many of the receptor sites to change their physical characteristics so that they are suitable for use as a bookstore is insurmountable and unreasonable. The physical features of the receiving sites present unreasonable obstacles to opening a bookstore. These hindrances are such that they cannot be overcome without incurring unreasonable expenses. Therefore, the suggested receiving sites are legally unavailable.

143. Application of the 500-foot separation requirement drastically reduces the actual number of potentially available relocation sites. One adult use in a designated area makes ineligible, for relocation, any other site within a radius of 785,398 square feet. Each additional use in a given receiving site substantially and significantly eliminates a corresponding body of land.

144. The Defendants have not provided a sufficient amount of land space that is a part of the generic commercial market upon which the Plaintiff and other bookstores with Booths can reasonably relocate.

145. After excluding those sites that may not be properly considered part of the relevant real estate market, as well as the commercial marketplace, there is not an adequate number of potential relocation sites for existing bookstores with Booths.

146. Even if a bookstore with Booths does manage to find an available retail store in a permissible area, the space may still be further encumbered because the standard commercial retail lease form in New York City has boilerplate language precluding "pornographic uses." Indeed, such language is

included in the standard lease forms of the Real Estate Board of New York ("REBNY") and the Bar Association of the City of New York's Committee on Real Property Law.

147. Under the Amended Zoning Resolution virtually all bookstores with Booths will have to (1) close their entire store and silence their expression; (2) close their Booths and silence their expression; or (3) continue operating under the specter and threat of criminal charges and/or nuisance abatement proceedings, among other possible sanctions.

148. Section 11-61 of the City's Zoning Resolution provides, in pertinent part, that the owner or operator of any place in violation of a provision of the Zoning Resolution "shall be guilty of a misdemeanor." Section 55.10(2)(b) of New York's Penal Law states that any offense defined outside this chapter which is declared by law to be a misdemeanor "shall be deemed a class A misdemeanor." P.L. § 70.15(1) then authorizes a sentence of imprisonment of up to one year for a class A misdemeanor. Therefore, criminal charges -- punishable by a year in jail -- may be filed against bookstore owners perceived to be in violation of the 2001 Resolution.

149. Irreparable injury is established when one is forced to choose between foregoing constitutional rights of free expression and facing criminal prosecution. The threat of criminal penalties under the 2001 Resolution is sufficient to constitute irreparable injury because it will have a "chilling effect on free expression."

150. The form of speech enjoyed by these Bookstores, which is protected by the First Amendment, will be irreparably harmed if the Bookstores are closed or forced to censor their expression. Because of the high premium placed upon free speech, its loss for even minimal periods of time constitutes irreparable injury.

151. The restrictiveness of the Amended Zoning Resolution seriously compromises the ability of New York City residents, as well as visitors, to gain access to a variety of constitutionally protected forms of information.

152. The allegations regarding the Amended Zoning Resolution are ripe and eligible for federal review.

## CAUSE OF ACTION I : INTERFERING WITH CONSTITUTIONALLY PROTECTED EXPRESSION

153. The Plaintiff repeats and realleges each and every allegation heretofore set forth as though fully set forth herein, and incorporates those facts and allegations in this Cause of Action by reference.

154. The Defendants, acting under color of law, have interfered with expression and entertainment in New York City in violation of the rights of the Plaintiff, and other bookstores in New York City that offer some adult oriented constitutionally protected information to the public, to free expression, equal protection and due process, under the First and Fourteenth Amendments to the United States Constitution.

**CAUSE OF ACTION II : INSUFFICIENT ALTERNATIVE AVENUES FOR FREE EXPRESSION**

155. The Plaintiff repeats and realleges each and every allegation heretofore set forth as though fully set forth herein, and incorporates those facts and allegations in this Cause of Action by reference.

156. The Defendants, acting under color of law, enacted the 2001 Resolution, and in its wake have undertaken significant rezoning of "permissible areas" for adult establishments, such that the 2001 Resolution fails to provide alternative avenues of communication and unconstitutionally limits potential locations for adult establishments.

157. By reason of the following, the 2001 Resolution is unconstitutional on its face, and as applied, and deprives the Plaintiff, other bookstores in New York City that offer some adult oriented constitutionally protected information to the public, and the public of their civil and constitutional rights, including, but not limited to, under the First and Fourteenth Amendments to the United States Constitution.

## CAUSE OF ACTION III : IMPOSING A PRIOR RESTRAINT

158. The Plaintiff repeats and realleges each and every allegation heretofore set forth as though fully set forth herein, and incorporates those facts and allegations in this Cause of Action by reference.

159. The Defendants, acting under color of law, have imposed a prior restraint and chilling effect on expression and entertainment in New York City in violation of the rights of the Plaintiff, and other bookstores in New York City that offer some adult oriented constitutionally protected information to the public, to free expression, equal protection and due process, under the First and Fourteenth Amendments to the United States Constitution.

## CAUSE OF ACTION IV : VIOLATION OF EQUAL PROTECTION

160. The Plaintiff repeats and realleges each and every allegation heretofore set forth as though fully set forth herein, and incorporates those facts and allegations in this Cause of Action by reference.

161. The Defendants, acting under color of law, subject adult establishments to differential treatment in connection with applications within the Building Department, and in other aspects, and, thus, deprive the Plaintiff, and other bookstores in New York City that offer some adult oriented constitutionally protected information to the public, of their constitutional right to equal protection under the law, in violation of the Fourteenth Amendment to the United States Constitution.

## CAUSE OF ACTION V : RESTRICTING AND DEPRIVING PROPERTY RIGHTS

162. The Plaintiff repeats and realleges each and every allegation heretofore set forth as though fully set forth herein, and incorporates those facts and allegations in this Cause of Action by reference.

163. The Defendants, acting under color of law, deprive the Plaintiff, and other bookstores in New York City that offer some adult oriented constitutionally protected information to the public, of their significant property rights without a sufficient legal or factual basis, and without due process, in violation of the First and Fourteenth Amendments to the United States Constitution.

### Claims for Relief

WHEREFORE, the Plaintiff demands judgment as follows:

(1)  Preliminary and permanent injunctions enjoining and restraining the Defendants, and their employees, agents and servants, from enforcing any provision of Text Amendment N 010508 ZRY to the City's Zoning Resolution -- or otherwise interfering with the exercise of the right to freedom of speech, property rights, and right to operate -- the establishments of the Plaintiff and other bookstores in New York City that offer some adult oriented constitutionally protected information to the public;

(2)  a judgment declaring the Text Amendment N 010508 ZRY to the City's Zoning Resolution, as it relates to bookstores arbitrary, unreasonable, discriminatory, confiscatory, void, unconstitutional on its face and as applied to the Plaintiff and other bookstores in New York City that offer some adult oriented constitutionally protected information to the public;

(3)  reasonable legal fees under 42 U.S.C. §§ 1983 and 1988;

(4)  costs and disbursements of this action; and

(5)  such other and further relief as shall seem just and proper including, but not limited to, interim injunctive relief, a hearing, and oral argument.

Dated:    New York, New York
          April 25, 2018


                          /s/ Erica T. Dubno
                         Erica T. Dubno, Esq.
                         Fahringer & Dubno
                         Herald Price Fahringer PLLC
                         767 Third Avenue, Suite 3600
                         New York, New York 10017
                         (212) 319-5351
                         (212) 319-6657 (fax)
                         erica.dubno@fahringerlaw.com

                         Counsel for the Plaintiff

## DECLARATION
(28 U.S.C. § 1746)

I, Daniel Knecht, hereby declare as follows:

1. I am a Member of 336 LLC, the Plaintiff in this lawsuit.

2. I have read the foregoing Complaint, and the facts alleged therein are true.

3. I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 25, 2018

_____
Daniel Knecht

56