ORAL ARGUMENT IS REQUESTED

# United States District Court
# Southern District of New York

336 LLC, d/b/a "The Erotica", et al.,

Plaintiffs,

v.

The City of New York, et al.,

Defendants.

## Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction

Docket No. 1:18-cv-3732 (WHP)
[Filed Electronically]

**Erica T. Dubno, Esq.**
Fahringer & Dubno
767 Third Avenue, Suite 3600
New York, New York 10017
(212) 319-5351
(212) 319-6657 (fax)
erica.dubno@fahringerlaw.com

Counsel for the Plaintiffs

# Table of Contents

Introduction ............................................................................................................... 1

Summary of the Reasons Why a Preliminary Injunction is Warranted ................................................................................................... 5

Standard for a Preliminary Injunction .............................................................. 10

POINT I

The Plaintiffs Will Suffer Irreparable Injury that is Likely to Occur ....................................................................................................... 12

POINT II

Granting a Preliminary Injunction is in the Public Interest and the Balance of the Equities Weighs in Favor of the Bookstores and Free Expression ........................................................ 16

POINT III

The Plaintiffs are Likely to Prevail on the Merits, and the City will be Unable to Meet its Burden of Showing Alternative Avenues for Expression and that Speech will Not be Impaired by Enforcement of the 2001 Resolution ...................................... 18

The Availability of Reasonable Alternative Locations Should be Considered on a County-by-County Basis ................................... 22

The City Imposes Other Burdens that Frustrate Expression and Minimize the Quantity and Accessibility of Adult Speech ............................................................................................................ 24

Conclusion ........................................................................................................ 25

## Table of Authorities

**Page(s)**

**Cases**

414 Theater Corp. v. Murphy,
    499 F.2d 1155 (2d Cir. 1974).........................................................................13, 14, 25

754 Orange Ave., Inc. v City of West Haven, Conn.,
    761 F.2d 105 (2d Cir. 1985)..................................................................................14, 25

Ashcroft v. A.C.L.U.,
    542 U.S. 656 (2004)...................................................................................................11

Bery v. City of New York,
    97 F.3d 689 (1996)....................................................................................................13

Bolger v. Youngs Drug Products Corp.,
    463 U.S. 60 (1983)....................................................................................................11

Bray v. City of New York,
    346 F. Supp.2d 480 (S.D.N.Y. 2004)..............................................................12, 14, 25

City of Los Angeles v. Alameda Books, Inc.,
    535 U.S. 425 (2002)...........................................................................................1, 11, 18

City of New York v. State of New York,
    76 N.Y.2d 479 (1990) .........................................................................................23, 24

City of Renton v. Playtime Theatres, Inc.,
    475 U.S. 41 (1986)..................................................................................................1, 18

Dombrowski v. Pfister,
    380 U.S. 479 (1965)..................................................................................................14

Elrod v. Burns,
    427 U.S. 347 (1976)...............................................................................................6, 13

Erznoznik v. City of Jacksonville,
    422 U.S. 205 (1975)..................................................................................................12

Evergreen Ass'n, Inc. v. City of New York,
    740 F.3d 233 (2d Cir. 2014)......................................................................................13

For the People Theatres of N.Y., Inc. v. City of New York,
    29 N.Y.3d 340 (2017), cert. denied, 138 S. Ct. 1000 (2018).........................................3

Hickerson v. City of New York,
    997 F. Supp. 418 (S.D.N.Y. 1998),
    aff'd, 146 F.3d 99 (2d Cir. 1998)........................................................................8

J & B Entertainment, Inc. v. City of Jackson, Miss.,
    152 F.3d 362 (5th Cir. 1998) .........................................................................11

Joseph Burstyn, Inc. v. Wilson,
    343 U.S. 495 (1952)........................................................................................12

Lim v. City of Long Beach,
    217 F.3d 1050 (9th Cir. 2000) .......................................................................11

M.W. v. New York City Dept. of Educ.,
    No. 15cv5029, 2015 WL 5025368 (S.D.N.Y. 2015) ....................................16

Miller v. California,
    413 U.S. 15 (1973)..........................................................................................12

Monserrate v. N.Y. State Senate,
    599 F.3d 148 (2d Cir. 2010)...........................................................................11

North Street Book Shoppe, Inc. v. Village of Endicott,
    582 F. Supp. 1428 (N.D.N.Y. 1984) ..............................................................15

Petereit v. S.B. Thomas, Inc.,
    63 F.3d 1169 (2d Cir. 1995)...........................................................................16

Phillips v. Borough of Keyport,
    107 F.3d 164 (3rd Cir. 1997) (en banc) .........................................................11

Reilly v. City of Harrisburg,
    858 F.3d 173 (3rd Cir. 2017) .........................................................................11

Reno v. A.C.L.U.,
    521 U.S. 844 (1997)........................................................................................22

Reuters Ltd. v. United Press Intern., Inc.,
    903 F.2d 904 (2d Cir. 1990)...........................................................................16

Schad v. Borough of Mount Ephraim,
    452 U.S. 61 (1987)..........................................................................................22

Smith v. California,
    361 U.S. 147 (1959)........................................................................................15

Stringfellow's of N.Y., Ltd. v. City of New York,
  91 N.Y.2d 382 (1998) ..................................................................................2, 8

TJS of New York, Inc. v. Town of Smithtown,
  598 F.3d 17 (2d Cir. 2010)...........................................................................2, 18

Trump v. International Refugee Assistance Project,
  137 S. Ct. 2080 (2017).....................................................................................16

United Yellow Cab Drivers Ass'n, Inc. v. Safir,
  No. 98-cv-3670-WHP, 2002 WL 461595 (S.D.N.Y. 2002) ........................................25

Winter v. NRDC, Inc.,
  555 U.S. 7 (2008) ...........................................................................................10

**Introduction**

The Plaintiffs comprise 12 bookstores and video stores ("bookstores") in three boroughs of New York City (Manhattan, Queens, and Brooklyn). They represent nearly half of the bookstores in the City that provide a measure of adult-oriented information to the public through private viewing booths, often referred to as "peep shows." The bookstores offer adult and non-adult expression to consenting adults, which is protected by the First Amendment. The Plaintiffs seek a preliminary injunction to stay enforcement of Text Amendment N 010508 ZRY to the Zoning Resolution of the City of New York (the "2001 Resolution"), which severely restricts where businesses offering adult entertainment may be located. The 2001 Resolution, which has never been enforced against existing businesses, also bans bookstores from exhibiting adult films in private viewing booths in virtually all of Manhattan and most of the outer boroughs.

Because of the free speech implications, local governments may only limit where adult businesses may operate if the municipality establishes that the zoning resolution serves a "substantial government interest and allows for reasonable alternative avenues of communication." City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 50 (1986). The municipality must also show "how speech would fare" under its new zoning ordinance. City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 444-53 (2002) (Kennedy, J., controlling concurrence). Therefore, the City must show that its regulation leaves the "quantity and accessibility of speech substantially intact." 535 U.S. at 449 (Kennedy, J., controlling concurrence).

In assessing the constitutionality of a zoning ordinance that suppresses free speech, "courts must consider the adequacy of alternative sites available at the time the ordinance is challenged" -- rather than when it was enacted. TJS of New York, Inc. v. Town of Smithtown, 598 F.3d 17, 22 (2d Cir. 2010). This is because "the First Amendment does not allow courts to ignore post-enactment, extralegal changes and the impact they have on the sufficiency of alternative avenues of communication." 598 F.3d at 23. Applying these abiding principles to this case it is immediately apparent that injunctive relief is warranted to maintain the existing status quo of no enforcement while the Court considers the merits of this Civil Rights action

New York City enacted its first adult zoning resolution back in 1995. At that time the City generated maps of the limited areas where exclusively adult businesses could be located (PJA.1540-1544). The 1995 Resolution was sustained, in large part, because the City claimed it allowed for reasonable alternative avenues of communication by leaving approximately four percent of the City's total land area accessible for adult uses (PJA.1446, 1539-1544). Stringfellow's of N.Y., Ltd. v. City of New York, 91 N.Y.2d 382, 403 (1998).

Based on rough calculations made using the 1995 maps, the City estimated that there were approximately 500 potential sites for adult establishments to be located across all of New York City. The City's estimation of possible sites was based solely on its computer-generated maps. The City did not consider whether there was development on any of the estimated sites. The City also never examined whether the areas were appropriate for bookstores or other commercial uses (PJA.1824, 1828).

In 2001, the City amended the Zoning Resolution to further restrict where adult businesses could be located. The City also eliminated, for theaters and clubs, the "60/40 Provision" pursuant to which businesses were able to remain in their existing locations if they reduced their adult component to less than 40 percent of their floor space and stock. Bookstores still had to comply with the 60/40 Provision. But the City included nine additional factors the Buildings Department could consider in determining whether a bookstore's compliance with the 60/40 Provision was genuine, or whether its non-adult material was really a sham (PJA.0049-0050).

Thus, under the 2001 Resolution, a bookstore that limits its adult material to less than 40 percent of its floor space and stock can still be closed down as an "adult establishment" if, for example, it has a greater variety of adult titles than non-adult titles, it bars minors from any area with non-adult material, or it has any private viewing booths. The 2001 Resolution also gives the Building Commissioner unbridled discretion to adopt rules to determine the "substantial purpose" of a bookstore when considering compliance with the Zoning Resolution (PJA.0050).

In enacting the 2001 Resolution the City did not prepare new maps showing updated permissible areas for adult establishments. The City did, however, concede that, based on zoning changes and other factors, the land area available for adult establishments had been reduced by approximately 265 acres. The City also estimated that the number of potential sites for adult businesses decreased by nine percent between 1995 and 2000 (PJA.1485).

After nearly two decades of litigation, which involved several findings that the 2001 Resolution was unconstitutional, the New York Court of Appeals ultimately upheld the zoning amendment. For the People Theatres of N.Y., Inc. v. City of New York, 29 N.Y.3d 340 (2017), cert. denied, 138 S. Ct. 1000 (2018). The State court decisions never addressed whether the 2001

Resolution currently allows for reasonable alternative avenues of communication. Through a series of stays and stipulations, the 2001 Resolution has never been enforced against existing businesses (PJA.1629, 1646, 1665, 1690).

The City now -- on the cusp of 2019 -- wants to enforce the 2001 Resolution. However, as developed below and more fully in the Declaration of Dr. Elliott Sclar, a top zoning expert from Columbia University, the zoning and landscape in New York have completely changed during the last 17 years. Indeed, approximately 40% of the City was rezoned between 2002 and 2012. There have also been, and continue to be, extensive rezoning of the remainder of the City. The zoning changes have largely been to the very Manufacturing districts that were indicated as permissible on the City's 1995 maps. New schools and churches, which cannot be within 500 feet of adult establishments, have also opened since 2001. There are additional factors, including development and the internet, that have further reduced the number of bookstores that provide adult information to the public (PJA.1624).

The bookstores in this action, as well as the clubs in the related actions[1], now seek refuge in this Court to enjoin the City from enforcing, for the first time, a stale zoning resolution against existing constitutionally protected businesses without consideration of whether alternative sites are available. The City also bears the burden of establishing that enforcement of its regulation will leave the quantity and accessibility of speech substantially intact.

--------

[1] 725 Eatery Corp. v City of New York, No. 1:02-cv-4431-WHP; 59 Murray Corp. v. City of New York, No. 1:02-cv-4432-WHP; and Club at 60th Street v. City of New York, No. 1:02-cv-8333-WHP.

As developed in the maps and sworn declarations contained in the Plaintiffs' Joint Appendix, the City will not be able to meet that burden because there are simply not enough potential locations in Manhattan to accommodate the existing bookstores and clubs. And, the accessibility of speech with be severely compromised if customers are forced to travel to the fringes of the outer boroughs to access constitutionally protected expression. Without a preliminary injunction, all of the Plaintiffs, as well as virtually all clubs offering topless dancing, and other small businesses, will be forced to close or drastically alter the nature of their expression while this Court considers the merits of these important constitutional claims.

### Summary of the Reasons Why a Preliminary Injunction is Warranted

For the convenience of the Court we have summarized the principal reasons why it is imperative that bookstores are allowed to continue to provide constitutionally protected expression to the public pending determination of the related challenges to the 2001 Resolution:

1. The highly controversial amendments, which were enacted back in 2001, have never been enforced against existing businesses. The bookstores have been operating in their current locations for, in some cases, more than a decade, without incident.

2. Bookstores across New York City face criminal charges as part of the City's enforcement campaign. Such a prosecution can subject the operator of a bookstore to a conviction and imprisonment of up to one year. Nothing is more chilling to the exercise of free speech than the threat of being thrown in jail.

3.  Bookstores also face nuisance abatement proceedings, including temporary restraining orders that could silence their expression and permanent injunctions that could close the business.

4.  The form of speech enjoyed by these bookstores, which is protected by the First Amendment, will be irreparably impaired if the bookstores are closed or forced to censor their expression. Because of the high premium placed upon free speech, its loss "for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976).

5.  A favorable judgment from this Court will be rendered meaningless if the 2001 Resolution is enforced during the time it takes to resolve the constitutional challenge. By then, it will be too late.

6.  A preliminary injunction is in the public interest and a balancing of the equities favors the bookstores. After 17 years, allowing small businesses to remain in place for an additional short period of time will harm no one. As developed in expert and other declarations, there is now extensive gentrification and development, including a substantial increase in median household incomes, in areas of Manhattan containing 60/40 businesses. There is also a marked decrease in crimes and increase in housing values in those areas. Gentrification, development, increased property values, and decreased crime, are also now evident in the outer boroughs where 60/40 bookstores have operated for years.

7.     However, enforcement of the 2001 Resolution will have calamitous consequences concerning free speech and the public's right to access a well-established form of constitutionally protected expression. These small bookstores are already struggling through various forces including, but not limited to, escalating rents, gentrification, and destruction of buildings for development. In addition, these bookstores -- like virtually all retail stores in New York -- are suffering under severe economic pressures from the Internet. However, the expression offered in booths is less influenced by the digital era because booths provide an "old school means by which a patron can watch erotica without anyone knowing his or her personal predilections, sexual fantasies, and fetishes." Therefore, the booths are an "important part of the business." And, loss of the booths will require bookstores to close or lose a critical aspect of the business.

8.     The closure of bookstores or aspects of the businesses will cause the

        a.   breaking of leases;

        b.   loss of employees;

        c.   forfeiture of customers;

        d.   destruction of valuable goodwill earned over substantial periods of time; and

        e.   loss of livelihood.

9.     Safeguarding constitutional rights, free expression, and jobs is clearly in the general public's interest.

10.     The City will not be prejudiced by continuing the state of affairs that has existed for 20 years. The bookstores are still subject to the rigorous regulations of the 1995 Resolution, which were upheld by the State's highest court and approved by the federal courts. Stringfellow's of New York, Ltd. v. City of New York, 91 N.Y.2d 382 (1998); Hickerson v. City of New York, 997 F. Supp. 418 (S.D.N.Y. 1998), aff'd, 146 F.3d 99 (2d Cir. 1998).

11.     The City Council recognized that there is no imminent risk of harm from the operation of these businesses because it provided that the 2001 Resolution would not become effective for a period of one year after its enactment. Z.R. § 72-41.

12.     The City, which bears the burden of proof on the ultimate question of the constitutionality of enforcing its stale zoning ordinance against constitutionally protected establishments, is not likely to succeed in this action in light of extensive zoning changes and other factors. And, even if the Plaintiffs must demonstrate a likelihood of success on the merits, which is disputed in this First Amendment case, there is a reasonable probability and a significant possibility the bookstores will ultimately prevail.

13.     The 2001 Resolution violates the First and Fourteenth Amendments because (a) it does not provide for reasonable alternative avenues of communication; and (b) its regulation does not leave the quantity and accessibility of speech substantially intact. As developed in the Declarations of Dr. Elliott Sclar, Dr. Lance Freeman, Dr. Hugh Kelly and Michael Berzak,

a. Because of extensive rezonings and other factors, there is "substantially less legally permissible area throughout the entire City for any new or relocating adult establishment than existed in 1995" when the City conducted its last study of permissible locations of adult uses (PJA.0003).

b. The number of existing bookstores with adult material has diminished substantially since 1995 and 2001, when the City enacted its adult zoning resolutions (PJA.0004, 0714).

c. There are no bookstores with booths in permissible areas for adult businesses in Manhattan (PJA.1654).

d. If the 2001 Resolution is enforced, there are, at most, 16 legally permissible areas where adult businesses could be located in Manhattan at the same time. However, there are currently at least 22 bookstores and clubs in Manhattan that would have to relocate (PJA.0004).

e. Manhattan "constitutes a distinct real estate market, particularly as to entertainment demand generally and adult entertainment demand in specific, which is separate and unique" from the outer boroughs. Therefore, bookstores in Manhattan should not be forced to endeavor to relocate in the outer reaches of the outer boroughs. And, patrons should not be forced to travel to a different county to view protected expression (PJA.0163, 1510).

    f.   Even within the outer boroughs, the City has extensively rezoned -- and continues to rezone -- Manufacturing areas on the fringes of the City, to render them unavailable to adult uses. And, bookstores are not allowed to be located in the main Manufacturing districts (M2 and M3) that are permissible for general adult uses. In addition, because of climate change and coastal erosion, the physical profile of the City has changed over the last two decades (PJA.1489-1491, 1498, 1500, 1747).

These are just some of the many reasons why the Plaintiffs -- not the City -- are likely to succeed on the merits of this action. This Court's intervention is needed to prevent further erosion of the First Amendment and to safeguard small businesses and the public's right to access information. The casualty list of bookstores that will be cut down by the 2001 Resolution is staggering. Enforcement of this decades-old zoning rule at this time calls radically into question our deepest assumptions concerning the manner in which bookstores protected by the First Amendment can be regulated.

**Standard for a Preliminary Injunction**

A preliminary injunction may be obtained if the movant can demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. NRDC, Inc., 555 U.S. 7, 20 (2008). The movant must establish "(1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships

tipping decidedly in favor of the moving party." Monserrate v. N.Y. State Senate, 599 F.3d 148, 154 (2d Cir. 2010) (citation omitted).

A movant seeking a preliminary injunction to safeguard free speech satisfies the likelihood of success standard where, as here, the City will not be able to meet the burdens it shoulders at trial. See Reilly v. City of Harrisburg, 858 F.3d 173, 180 (3rd Cir. 2017); Ashcroft v. A.C.L.U., 542 U.S. 656, 666 (2004) (where the government bears the ultimate burden in a free speech case, the party seeking a preliminary injunction "must be deemed likely to prevail" unless the government shows that it can meet its burden).

Here, because of the First Amendment implications, the City bears the burden of proving the existence of alternative avenues of communication. Alameda Books, 535 U.S. at 433 (noting that an adult use ordinance would be upheld if the municipality "showed that its ordinance was designed to serve a substantial government interest and that reasonable alternative avenues of communication remained available"). See also Lim v. City of Long Beach, 217 F.3d 1050, 1052 (9th Cir. 2000); J & B Entertainment, Inc. v. City of Jackson, Miss., 152 F.3d 362, 370 (5th Cir. 1998); Phillips v. Borough of Keyport, 107 F.3d 164, 177 (3rd Cir. 1997) (en banc). This is because the party seeking to restrict expression must justify that restriction. Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 71 n.20 (1983).

However, as developed in the formidable array of expert declarations and exhibits contained within the Plaintiffs' Joint Appendix, and developed below, the City is not likely to demonstrate that, today, reasonable alternative avenues of communication remain available. The City also will not be able to demonstrate that the quantity and accessibility of speech will remain substantially intact.

The City may claim that "when the injunction would alter rather than maintain the status quo, the standard is elevated to a 'clear or substantial likelihood of success.'" Bray v. City of New York, 346 F. Supp.2d 480, 486 (S.D.N.Y. 2004) (Pauley, J. granting injunctive relief against the City), quoting Sunward Elec. Inc. v. McDonald, 362 F.3d 17, 24-25 (2d Cir. 2004). However, that higher standard should not come into play here. The injunction sought by the bookstores would effectively maintain -- not alter -- the existing status quo of no enforcement of the 2001 Resolution. Technically the 2001 Resolution became enforceable in June of 2017.  However, under the aegis of a stipulation (PJA.1876), the Plaintiffs' bookstores, and others, continue to provide the public with constitutionally protected expression. From an equitable standpoint, only a likelihood of success, not a substantial probability of success, should be required. Regardless, the Plaintiffs satisfy both standards.

## POINT I

### The Plaintiffs Will Suffer Irreparable Injury that is Likely to Occur

It is well settled that "motion pictures are a significant medium for the communication of ideas." Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501 (1952). There is no contention that this brand of information is legally obscene under prevailing constitutional standards. See Miller v. California, 413 U.S. 15 (1973). Thus, it is fully protected by the First and Fourteenth Amendments to the United States Constitution. Erznoznik v. City of Jacksonville, 422 U.S. 205, 208 (1975). Private viewing booths "allow consenting adults to view a wide range of sexually explicit material within the privacy and sanctity of a safe space. No one knows what selection a person is viewing. Therefore, booths allow patrons to watch films that some might believe are deviant, aberrant, queer, perverse or unorthodox, within a judgment-free zone" (PJA.1620). The impairment or loss

of free speech "freedoms for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod, 427 U.S. at 373, citing New York Times Co. v. United States, 403 U.S. 713 (1976). See also Bery v. City of New York, 97 F.3d 689, 693 (1996).

The 2001 Resolution, which bars bookstores from exhibiting films in private viewing booths and restricts the variety of titles a bookstore can offer to the public, directly limits speech. And, as such, the "irreparable nature of the harm may be presumed." Evergreen Ass'n, Inc. v. City of New York, 740 F.3d 233, 245 (2d Cir. 2014). See also 414 Theater Corp. v. Murphy, 499 F.2d 1155, 1160 (2d Cir. 1974) (removing viewing booths "involves a deprivation of" the bookstore owner's and "the public's first amendment rights to show and view films, and in itself constitutes irreparable injury justifying injunctive relief, because there is no means to make up for the irretrievable loss of that which would have been expressed").

Criminal charges -- punishable by a year in jail -- may be filed against bookstore owners perceived to be in violation of the 2001 Resolution. Section 11-61 of the Zoning Resolution provides, in pertinent part, that the owner or operator of any place in violation of a provision of the Zoning Resolution "shall be guilty of a misdemeanor." Section 55.10(2)(b) of New York's Penal Law states that any offense defined outside this chapter which is declared by law to be a misdemeanor "shall be deemed a class A misdemeanor." P.L. § 70.15(1) then authorizes a sentence of imprisonment of up to one year for a class A misdemeanor. Thus, the operator of a bookstore is subject to conviction and imprisonment if minors are excluded from any non-adult areas, there are adult viewing booths, or the bookstore has a greater variety of adult titles than non-adult titles (PJA.0050, 1627, 1631).

Irreparable injury is established when one is forced to choose between foregoing constitutional rights of free expression and facing criminal prosecution. See 754 Orange Ave., Inc. v City of West Haven, Conn., 761 F.2d 105, 114 (2d Cir. 1985) ("lest there be any doubt as to irreparability of harm were the present ordinances to be enforced to prevent the coin-operated film machines from being utilized," the bookstore would "be required to choose between continuing without a license in its business, thereby subjecting itself and its employees to the threat of criminal and civil prosecutions, or removing the machines from its premises"); 414 Theater Corp., 488 F.2d at 1153 ("[w]here other plaintiffs have faced the similar situation of being required to forgo constitutionally protected activity in order to avoid arrest, the Supreme Court has found irreparable injury").  Indeed, the threat of criminal penalties authorized by the Zoning Resolution is sufficient to constitute irreparable injury because it potentially will have a "chilling effect on free expression." See Dombrowski v. Pfister, 380 U.S. 479, 487 (1965).

The harm that the Plaintiffs anticipate -- criminal charges and nuisance abatement proceedings -- is likely to occur unless the Court issues a preliminary injunction. The New York Law Journal recently quoted a spokesman for the City's Law Department who "made it clear the current administration will continue to support the Mayor Rudy Giuliani-era law." Colby Hamilton, "Adult Businesses Reboot Federal Suits Challenging Restrictive Zoning Plan", N.Y.L.J. (May 7, 2018). An injury is likely to occur where, as here, a "defendant has previously engaged in a pattern of similar acts." Bray, 346 F. Supp.2d at 487. Significantly, "[w]hen the City enforced the 1995 Resolution, it sought orders to show cause to close bookstores under the Nuisance Abatement Law. The City also brought criminal prosecutions against bookstores" (PJA.1632). Daniel Zazzali, who operates two bookstores, states: "I am 66 years old and have a family. I would

stop showing films in our booths, and, if necessary, close the bookstores rather than risk being thrown in jail or facing criminal prosecution" (PJA.1632).

Furthermore, requiring bookstores to self-censor can be as, if not more, pernicious than direct governmental censorship. It may very well result in managers of establishments, rightly fearful of civil and criminal sanctions, halting the exhibition of any adult-oriented expression, despite its constitutional protection. See, e.g., Smith v. California, 361 U.S. 147, 153 (1959) (the specter of the application of severe sanctions will "tend to restrict the public's access to forms of the printed word which the State could not constitutionally suppress directly. The bookseller's self-censorship, compelled by the State, could be a censorship affecting the whole public, hardly less virulent for being privately administered").

Even if Plaintiffs are not forced to close or relocate, irreparable harm exists if the businesses are compelled to alter the nature of their expression so as to comply with the 2001 Resolution. While some bookstores may come into compliance by removing their private viewing booths and drastically altering the nature of their stock, such alternatives impose impermissible restrictions on free expression. North Street Book Shoppe, Inc. v. Village of Endicott, 582 F. Supp. 1428, 1432 (N.D.N.Y. 1984) (enforcement of an adult zoning ordinance enjoined where the municipality was instructing the bookstore to "curtail its lawful speech or relocate; each alternative constitutes a significant burden on lawful speech").

In addition, as developed in the compelling declarations of three store owners, if they are required to close their stores or aspects of the businesses, this will cause the bookstores to lay off longtime employees, break leases, forfeit customers, lose goodwill, and lose their livelihood (PJA.1629, 1647, 1665). A "[m]ajor disruption of a business can be as harmful as its termination and thereby constitutes irreparable harm." Petereit v. S.B. Thomas, Inc., 63 F.3d 1169, 1186 (2d Cir. 1995). Moreover, loss of customers and goodwill can be irreparable harm. Reuters Ltd. v. United Press Intern., Inc., 903 F.2d 904, 909 (2d Cir. 1990). Forcing the Plaintiffs to close, or censor the nature of their expression, will have dire and irreparable implications.

## POINT II

### Granting a Preliminary Injunction is in the Public Interest and the Balance of the Equities Weighs in Favor of the Bookstores and Free Expression

The determination of whether to grant a preliminary injunction "is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." Trump v. International Refugee Assistance Project, 137 S. Ct. 2080, 2087 (2017). The purpose of such injunctive relief is "not to conclusively determine the rights of the parties," but, instead, "to balance the equities as the litigation moves forward." Id. Moreover, when a "request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." M.W. v. New York City Dept. of Educ., No. 15cv5029, 2015 WL 5025368 (S.D.N.Y. 2015) (Pauley, J.)(granting injunction), quoting Time Warner Cable of New York City v. Bloomberg L.P., 118 F.3d 917, 929 (2d Cir.1997).

16

Here, the public interest and a balancing of the equities favor maintaining the status quo of no enforcement that has existed for the last 17 years. As indicated, even though the challenged zoning resolution was enacted back in 2001, it has never been enforced against existing businesses. The bookstores have numerous employees who will be put out of work if enforcement proceedings are brought. Each of the "25 bookstore with booths in New York City employs people and provides expression to the public. If injunctive relief is not issued, more than 100 will lose their jobs" (PJA.1630). Certainly, it is in the public interest to allow these taxpaying, lawful businesses to continue to operate until this constitutional case is resolved.

There is no harm to the City or the public from allowing these bookstores to continue to operate until this matter can be determined. Any concerns regarding adverse secondary effects that impelled the 1995 Resolution, and on its coattails the 2001 Resolution, no longer exist. Many of the Plaintiffs are integral parts of their communities. Gentrification, development, increased property values, and decreased crime, are now evident throughout the City where 60/40 bookstores have operated for years. Yitzik Shachaf, who owns a bookstore in Brooklyn, establishes that "[o]ver the last three decades the area where the Bookstore is located has changed significantly. When we first opened the Bookstore, this was a seedy, industrial area, beneath the Gowanus Expressway. Since we have been there, the neighborhood has experienced tremendous development and gentrification. Real estate values have markedly increased over the last decade and the area seems substantially safer" (PJA.1667).

Similarly, Dr. Lance Freeman, a professor of Urban Planning at Columbia University, details that there is currently extensive gentrification and development, including a substantial increase in median household incomes, in areas of Manhattan containing 60/40 businesses. There is also a marked decrease in crime and increase in housing values in those areas (PJA.0216-0223). Finally, any tenuous claims of harm are in no way as imminent or grave as the Plaintiffs' loss of free expression rights, extreme financial hardship, loss of business and livelihood, or risk of criminal prosecution.

## POINT III

### The Plaintiffs are Likely to Prevail on the Merits, and the City will be Unable to Meet its Burden of Showing Alternative Avenues for Expression and that Speech will Not be Impaired by Enforcement of the 2001 Resolution

Even though the disputed resolution was enacted back in 2001, the City still bears the burden of establishing that, as of today, its zoning resolution "allows for reasonable alternative avenues of communication." Renton, 475 U.S. at 50; TJS of New York, 598 F.3d at 22. Under Justice Kennedy's controlling concurrence in Alameda Books, the municipality must also show "how speech would fare" under its zoning ordinance. 535 U.S. at 444-53. Therefore, the City must demonstrate that the 2001 Resolution leaves the "quantity and accessibility of speech substantially intact." 535 U.S. at 449 (Kennedy, J., controlling concurrence).

A challenge to the 2001 Resolution may be brought at this time because the "alternatives available when a statute is passed can disappear, thus decreasing the adequacy of alternative sites actually available to would-be speakers." TJS of New York, 598 F.3d at 22, citing Topanga Press, Inc. v. City of Los Angeles, 989 F.2d 1524, 1532 (9th Cir. 1993). The First Amendment inquiry must be attuned to the reality that New York City, and its landscape, are constantly changing. As

recognized by the Department of City Planning, "[t]ime passes, land uses change, and zoning policy accommodates, anticipates and guides these changes. In a certain sense, zoning is never final; it is renewed constantly in response to new ideas -- and to new challenges" (PJA.1607).

As developed in Dr. Sclar's declaration, New York is a very different place in 2018 than it was when the City's maps of permissible areas were created 23 years ago, and when the 2001 Resolution was enacted 17 years ago. Between 1995 and 2001, there were 13 zoning changes, which rezoned certain areas where adult uses had been permitted (PJA.1485, 1545-1560). In addition, new churches and schools opened, which further reduced the number of potential development sites. As a consequence, the City conceded that "the estimated number of potential sites for adult businesses in New York City decreased by 9% between 1995 and 2000" (PJA.1861).

Then, between 2002 and 2012, nearly 40% of the City was rezoned. Much of that rezoning was in Manufacturing areas, which include many of the limited permissible areas for adult uses (PJA.1486-1487, 1561-1575). Indeed, a "hallmark of Mayor Michael Bloomberg's administration was to 'remake the city's landscape for the 21st century, pushing for higher-density development and higher-quality design and opening up the city's vast waterfront to new residential, recreational and commercial uses'" (PJA.1486). According to the Department of City Planning, from 2002 to January 2012, Manufacturing districts decreased from 21,653 acres to 20,450 acres, a reduction of 1,152 acres (approximately 5.2% reduction) across the City (PJA.1301-1302).

The intensive rezoning continued after 2012. Between January 2002 and September 2018, there were "509 adopted rezonings" (PJA.1489). Approximately one third of those rezonings involved a conversion of Manufacturing to another form of use (PJA.1489, 1596). Because a picture is worth a thousand words, Dr. Sclar generated a map from the City's data files depicting, in red, some of the many zoning changes in New York between 2002 and the present (PJA.1594).

Back in 2001, when the City enacted its resolution, there were 69 adult businesses in Manhattan (with 56 operating as 60/40 establishments). (PJA.0714). To the best of our knowledge, today there is only one bookstore in Manhattan within a permissible area for adult establishments -- 300 West 40th Street. That small bookstore, which is not at street level and is located down a stairway to the subway, does not have booths (PJA.1654). There appear to be eight clubs and 14 bookstores with adult viewing booths remaining in Manhattan that would be subject to closure and criminal charges if the 2001 Resolution is enforced.

As developed in the comprehensive declaration of Michael Berzak, which is supported by detailed maps, there is "substantially less legally permissible area throughout the entire City for any new or relocating adult establishment than existed in 1995" when the City conducted its last study of permissible areas (PJA.0003) (emphasis in original). Mr. Berzak concluded that there are "no more than 16 legally permissible sites in Manhattan" (PJA.0003). Because of additional zoning and "use group" restrictions, only 13 of those areas would be permissible for bookstores. Therefore, there would be "a minimum of 22 displaced 60-40 businesses and likely several more depending on the ultimate number of bookstores" in Manhattan (PJA.0004). And, at most, there are only three permissible sites in Manhattan that have the potential to be commercially viable for certain adult uses. Id.

Mr. Berzak also found that there is "<u>substantially</u> less legally permissible area today for adult entertainment businesses in the Outer Boroughs than at the time the [Department of City Planning] prepared its 1995 Maps" (PJA.0013) (emphasis in original). The Plaintiffs cannot provide a reasonable estimate of the reduced number of permissible sites in the outer boroughs because they do not have the City's resources and cannot identify "all properties which are currently occupied by 'schools,' 'houses of worship,' adult entertainment businesses, or which are encumbered or otherwise unavailable for any commercial purpose" (PJA.0013-0014). Therefore, it is incumbent upon the City, which bears the burden on this issue, to prepare updated maps indicating currently existing permissible areas.

Moreover, the City continues to rezone areas. As of September 2018, there were at least six certified rezonings that have yet to be adopted which will involve a conversion of Manufacturing into some other use (PJA.1492). Mayor Bill de Blasio's administration is very focused on rezoning parts of the City to create affordable housing. Some of these rezonings apparently overlap with or border the limited permissible areas for adult establishments (PJA.1493, 1587). The zoning in the City is changing and in flux. As recognized by Dr. Sclar, "[v]irtually no rational business person would invest, enter into long term leases, develop real estate, or take other costly steps to open a video store, with substantial and expensive booths, without any assurance that (1) the area is permissible for adult establishments and (2) the area will remain permissible with sufficient time to achieve a reasonable return on invested capital" (PJA.1494, 1640).

### The Availability of Reasonable Alternative Locations
### Should be Considered on a County-by-County Basis

As recognized by Dr. Sclar and Dr. Kelly, Manhattan should be treated as a distinct real estate market for purposes of alternative avenues of expression (PJA.0163, 1510). Manhattan is sui generis. There is no place like it in the world. The availability of reasonable alternative locations should be assessed on a county-by-county basis -- not a City-wide basis. Plaintiff businesses that are currently located in one county should not be forced to relocate to another county because of an insufficient number of alternative sites within their own county. It violates the First Amendment to require bookstores to find a new audience and locate in another county. In Schad v. Borough of Mount Ephraim, 452 U.S. 61, 76 (1987), the Court recognized that, "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." See also Reno v. A.C.L.U., 521 U.S. 844, 880 (1997) (same).

Requiring community bookstores to relocate into remote areas of other counties also will deny patrons access to expression protected by the First Amendment. Upon information and belief, there are currently only two bookstores with booths in permissible areas -- one near John F. Kennedy Airport in Queens and another in western Staten Island (PJA.1654-1655). The building housing the bookstore in Queens has been sold and will no longer be used for adult entertainment (PJA.1655, 1667-1668).

The Knecht Declaration establishes that many customers go to The Erotica Bookstore, located at 336 Eighth Avenue in Manhattan, "because it is convenient and within walking distance of their homes or offices" (PJA.1648). That bookstore "caters, in part, to the artistic community around the Fashion Institute of Technology and the gay community of Chelsea." Id. The owners

22

"would not endeavor to relocate our booths and business outside of Manhattan because, among other issues, it is inconsistent with our business plan." Id. In addition, bookstores in Manhattan "have a number of customers who use wheelchairs or have other disabilities" (PJA.1641). These patrons will be frustrated when they endeavor to access this expression. Indeed, the only remaining bookstore with booths is on Staten Island -- nearly two hours, by public transportation, from The Erotica bookstore in Chelsea (PJA.1655, 1660-1661).

Each of the five counties of New York City differs significantly from the others in terms of ethnicity, ancestry, economic background, race, national origin, residential patterns, occupational structure, household and marital patterns, cultural traditions and attributes, patterns of leisure use and other elements of social structure (PJA.1508). In fact, Staten Island attempted to secede from New York City because of its sense of independence as well as demographic and economic differences, which alienate it from the other four boroughs (PJA.1807). City of New York v. State of New York, 76 N.Y.2d 479 (1990). It costs $17 just to drive to Staten Island, which is not accessible by the City's subway system (PJA.0204, 1668, 1768). And, the only train line on Staten Island is on the complete opposite side of the county -- miles away from most of the permissible areas indicated in the City's 1995 maps (PJA.1510, 1615).

In addition, the limited remaining permissible areas in the outer boroughs are, predominantly, located in Manufacturing Districts (M1, M2 and M3). However, as developed in Dr. Sclar's declaration, there are additional Use Group restrictions in the Zoning Resolution which prevent bookstores from operating in heavy manufacturing areas (M2 and M3). (PJA.1500). Therefore, any determination of permissible areas for bookstores must exclude M2 and M3 districts.

**The City Imposes Other Burdens that Frustrate Expression and Minimize the Quantity and Accessibility of Adult Speech**

Even if a bookstore endeavors to relocate in one of the very limited permissible areas, the City now imposes onerous and discriminatory burdens on adult establishments that are not imposed on other types of uses. For instance, the City's permitting scheme "imposes at least two substantial unique burdens on adult businesses <u>not</u> imposed on any other type of businesses seeking building permits" (PJA.0108). Specifically, unlike any other retail use which can submit "self-certified" plans for work by a licensed architect or qualified engineer, a bookstore owner who wishes to open an adult establishment must endure a "lengthy plan approval process" by Building Department inspectors (PJA.0108). This "dramatically increases the time it takes to get plans approved for adult businesses compared to the time required by all other types of businesses." <u>Id.</u> In addition, the City "subjects adult businesses (and no others) to a time-consuming process of at least three months solely for zoning review by DOB legal counsel before DOB plan examiners will even <u>start</u> their review of submitted building plans" (PJA.0108) (emphasis in original).

If the 2001 Resolution is enforced, and bookstores are no longer able to exhibit films in their booths, it could take years before a bookstore with booths may be able to open in a permissible location. And, even if an application for an adult establishment is filed first, the use will be denied if a church or school decides to open within 500-feet of the location while the application is pending (PJA.0109). Therefore, there is a "significant risk that a business which has expended a great deal of time, effort and money to secure a lawful location and which was the first to file the requisite permit application(s) would be prohibited from opening" (PJA.0109). Finally, there is a likelihood the Plaintiffs will succeed on the other claims in the Complaint, thus justifying the issuance of a preliminary injunction.

Enforcement of ordinances which impinge on precisely this form of expression -- adult booths in bookstores -- has been regularly stayed pending a final determination of the constitutionality of the ordinance. See, e.g., 754 Orange Ave., 761 F.2d at 107; 414 Theater Corp., 499 F.2d at 1160. Moreover, this Court has granted preliminary injunctions against municipalities where constitutionally rights were similarly at risk. See, e.g., United Yellow Cab Drivers Ass'n, Inc. v. Safir, No. 98-cv-3670-WHP, 2002 WL 461595 (S.D.N.Y. 2002) (preliminary injunction issued and Court ultimately found that the City failed to prove it left open alternative channels of speech for protesting taxi drivers); Bray v. City of New York, 346 F. Supp.2d 480 (S.D.N.Y. 2004) (preliminary injunction granted to prevent the City from seizing bicycles if people participated in a mass bicycle ride). This list is illustrative only and by no means exhaustive.

## Conclusion

For all these reasons, as well as those advanced in the Plaintiffs' Joint Appendix, we request that pursuant to Fed. R. Civ. P. Rule 65, this Court enjoin and restrain the Defendants, their officers, agents, servants and employees, and all other persons acting under or on their behalf, during the pendency of this matter, from enforcing or otherwise requiring compliance with Text Amendment N 010508 ZRY and grant such other and further relief as is justified under all the circumstances of this case.

New York, New York
November 21, 2018

Respectfully submitted,
/s/ Erica T. Dubno
Erica T. Dubno, Esq.
Fahringer & Dubno
767 Third Avenue, Suite 3600
New York, New York 10017
(212) 319-5351
Counsel for the Plaintiffs

25